# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

JESSE JAMES KING,

    Plaintiff,

  v.

TOM BOSENKO, et al.,

    Defendants.

No.  2:12-cv-2940 CKD P

ORDER

Plaintiff is a California prisoner proceeding pro se.  Defendants Bosenko, Kent, Harmon and Sokol (defendants) are all current or former employees of Shasta County.  Defendants have filed a motion for summary judgment with respect to plaintiff's remaining claims arising under the First Amendment.[1]  The parties have consented to have all matters in this action before a United States Magistrate Judge.  See 28 U.S.C. § 636(c).

I. Plaintiff's Allegations

In his complaint, which is signed under the penalty of perjury, plaintiff alleges that he requires a vegetarian diet because he is Buddhist.  Beginning in April of 2012, plaintiff was housed at the Shasta County Jail.  Plaintiff requested a vegetarian diet from defendant Harmon, who was the chaplain at the Shasta County Jail, but was denied.  Plaintiff also requested a

---

[1] The court notes that plaintiff has filed a sur-reply regarding defendants' motion for summary judgment.  Because plaintiff was not granted leave to file a sur-reply, it will not be considered.  See Local Rule 230.

vegetarian diet from defendant Sokol, a "Jail Kitchen Administrator," and from defendants Lt. Kent and Sheriff Bosenko. All requests were denied. Plaintiff asserts that because he was not provided a vegetarian diet, he was in "near starvation" for 7 months and had failing health.

II. Request For Injunctive Relief And RLUIPA

In the court's December 11, 2012 screening order, the court found that plaintiff's allegations state claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA). While plaintiff seeks damages and injunctive relief in his complaint, injunctive relief is no longer warranted since plaintiff now resides in the California Department of Corrections and Rehabilitation rather than the Shasta County Jail. See Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (plaintiff being transferred from one prison to another generally moots claim for injunctive relief related to prison conditions). Furthermore, it appears in April of 2013, Shasta County changed its policy concerning vegetarian meals at the Shasta County Jail. From that point on, an inmate could obtain a vegetarian meal simply be requesting one.

Also, because plaintiff can no longer obtain injunctive relief, any claims arising under RLUIPA must be dismissed because damages cannot be obtained under RLUIPA against individuals. Wood v. Yordy, No. 12-35336, 2014 WL 2462575, at *4 (9th Cir. June 3, 2014).

III. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See

1  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an
2  essential element of the nonmoving party's case necessarily renders all other facts immaterial."
3  Id.
4       If the moving party meets its initial responsibility, the burden then shifts to the opposing
5  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita
6  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the
7  existence of this factual dispute, the opposing party may not rely upon the allegations or denials
8  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,
9  and/or admissible discovery material, in support of its contention that the dispute exists or show
10 that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.
11 R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the
12 fact in contention is material, i.e., a fact that might affect the outcome of the suit under the
13 governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,
14 Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
15 genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving
16 party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).
17      In the endeavor to establish the existence of a factual dispute, the opposing party need not
18 establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual
19 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
20 trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce
21 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
22 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
23 amendments).
24      In resolving the summary judgment motion, the evidence of the opposing party is to be
25 believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the
26 facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475
27 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
28 obligation to produce a factual predicate from which the inference may be drawn.  See Richards

1  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

2  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

3  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

4  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

5  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

6  IV. Arguments And Analysis

7       A. Law Regarding Free Exercise Rights Of Prisoners

8       The protection of the Free Exercise Clause of the First Amendment is triggered when

9  prison officials infringe upon the practice of an inmate's religion by preventing him from

10  engaging in conduct which he sincerely believes is consistent with his faith.  Shakur v. Schriro,

11  514 F.3d 878, 884–85 (9th Cir.2008).  The court is not concerned with whether the practice at

12  issue (in this instance, vegetarianism) is central to a plaintiff's faith in the general sense. Rather

13  the focus is on whether plaintiff sincerely believes the practice at issue is consistent with his faith.

14  Id.  Essentially they argue that plaintiff is not really a Buddhist, and plaintiff has not otherwise

15  shown that vegetarianism is dictated by his religious beliefs.

16       In McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir.1987), the Ninth Circuit held that

17  "[i]nmates . . . have the right to be provided with food sufficient to sustain them in good health

18  that satisfies the dietary laws of their religion."  However, an inmate's rights arising under the

19  First Amendment are necessarily limited by incarceration and may be curtailed by prison officials

20  in the furtherance of legitimate correctional goals.  O'Lone v. Shabazz, 482 U.S. 342, 348 (1987).

21  In order to establish a violation of the Free Exercise Clause, a prisoner must show that a prison

22  official burdened the practice of his religion without any justification reasonably related to

23  legitimate penological interests.  Shakur, 514 F.3d at 883-84.   The following factors should be

24  considered when determining whether a regulation or practice which impinges on a prisoner's

25  exercise of his religion is reasonable: 1)  whether there is a valid rational connection between the

26  regulation or practice and the legitimate governmental interest put forward to justify it; 2)

27  whether there are alternative means for exercising the right in question; 3) the impact

28  accommodation of the exercise at issue would have on prison personnel and resources; and 4)

whether the regulation or practice is unreasonable because there are obvious, non-obtrusive alternatives available. Turner v. Safley, 482 U.S. 78, 89-90 (1987). The court has considered the Turner factors as integrated in the discussion below.

    B.  Defendant Kent

Defendants point to evidence indicating that it was ultimately up to defendant Kent as to whether plaintiff would receive a vegetarian diet based upon his religious beliefs as Kent, at the relevant period of time, was responsible for day-to-day operations at the Shasta County Jail. Plaintiff does not meaningfully dispute this. In his affidavit, defendant Kent asserts, in relevant part, as follows:

> 2. I have reviewed Shasta County Jail records regarding Mr. King's incarceration in the current matter from April 28, 2012 to [October 11, 2013].
>
> 3. Each time an inmate is brought into the Shasta County Jail, the inmate is asked a number of questions about his background as part of the jail intake process. One of those questions involves whether the inmate has a religious preference. At the time of plaintiff King's intake as part of the . . . incarceration [beginning] April 28, 2012, Mr. King was asked whether he had any religious affiliation. He answered, "No. . ." [Exhibit B.]
>
> 5. If an inmate in the Shasta County Jail wishes to request information from the Jail, the inmate is provided with a Request For Information form which the inmate can use to make a written request to Jail officials for information or action. If an inmate wishes to request a religious diet, the inmate is instructed to use the Request For Information form and direct the request to the Jail Chaplain. The Jail Chaplain, at the time relevant to Mr. King's complaint was Mike Harmon. During his many incarcerations at the Shasta County Jail, Mr. King's Jail records indicate that he has submitted numerous Requests For Information on a variety of subjects. . . Mr. King knows how to use the Request For Information process at the Shasta County Jail and exercised that process on a number of occasions prior to his incarceration [beginning] April 28, 2012.
>
> 6. After his intake into the Jail on April 28, 2012, Mr. King did not make a request for a religious diet until October 12, 2012. At that time, for the first time following his intake on April 28, 2012, Plaintiff submitted a written Request For Information form, on the standard jail form, to jail officials requesting a religious diet. [Exhibit D.]
>
> 7. At the time that Mr. King made a request for a religious diet, in October 2012, the Jail policy when an inmate made a request for a religious diet was to ask that the jail chaplain, Mike Harmon,

interview the inmate to evaluate whether the inmate was sincere in his request for a religious diet. In this case, in response to Mr. King's request in October 2012, Mr. Harmon was asked to interview Mr. King for that purpose. Jail records prepared by Mr. Harmon indicate that Mr. Harmon interviewed Mr. King on October 16, 2012 pursuant to the Jail policy. [Exhibit E.]

8. Mike Harmon submitted a report to me regarding his interview of plaintiff King. [Exhibit F.] In his report, Mr. Harmon included that Mr. King was not sincere in his request for a religious diet. I reviewed the Harmon report and the interview forms, including the questions asked and answers provided by Mr. King. Mr. Harmon reported that Mr. King was not able to answer the majority of what Mr. Harmon considered to be basic questions regarding the Buddhist religion. It appeared from the forms that Mr. Harmon was correct that Mr. King was unable to accurately answer the majority of the questions. In addition, Mr. Harmon reported that during the interview process, Mr. King appeared to be rolling his eyes, which Mr. Harmon interpreted as an indication that Mr. King was not serious about the interview and was not sincere in his claimed basis for his request for a religious diet. . .

11. As part of my review of prior jail records regarding plaintiff King, I determined that on a prior occasion, while incarcerated at the Shasta County Jail, Plaintiff King in November 2011 had requested a religious diet which he at that time identified in a Request for Information as a *vegan* diet. [Exhibit G.] At that time, jail kitchen manager Dave Sokol reviewed the request and in writing advised Plaintiff King that a vegan diet did not comply with Title 15. There was a further exchange of information between King and Sokol wherein King clarified that he was asking for a vegetarian diet based on his Buddhist religion. In response in November 2011, Chaplain Harmon was asked to interview Plaintiff King pursuant to jail policy to evaluate whether Plaintiff King was sincere in his request. At that time, Harmon interviewed King, King was unable to correctly answer the most basic questions regarding the Buddhist religion submitted to Plaintiff King by Harmon and as a result, Harmon concluded that Plaintiff King was not sincere in his request. . . [Exhibit H.] Notwithstanding Harmon's conclusion, in November 2011, the then-jail commander decided to grant Plaintiff King's request for a religious diet.

12. After reviewing the above-jail records regarding Plaintiff King, I concluded that King knew how to use the jail request for information process to request a religious diet, did not request a religious diet for over five months after being incarcerated on April 28, 2012, and over the course of two interviews with Mike Harmon was unable to answer basic questions regarding the Buddhist religion. . . In addition, I concluded that upon being questioned at intake into the Shasta County Jail on April 28, 2012, Mr. King did not identify a religious preference to the service officer conducting the intake according to jail records. As a result of this information, I concluded that Mr. King was not sincere in is request for a religious diet and denied his request.

6

13. I have been employed with the Shasta County Sheriff's Department since May 1991. I have nine years of experience working in the jail and two years' experience as a lieutenant in charge of jail operations. I have attended a number of training courses regarding jail policies, procedure and operations. I am knowledgeable about the policy at the Shasta County Jail regarding evaluation of jail inmate requests for a religious diet as the policy existed from April 2012 to April 2013. That policy required the jail chaplain to evaluate whether the inmate was sincere in his request for a religious diet. The reason for the policy was that jail inmates sometimes and some inmates oftentimes make requests of jail staff including special diet requests and including religious diet requests in order to cause trouble for jail staff, in order to create friction with the jail staff or between inmates and for the purpose of exercising power over jail staff to require staff to comply with their demands. Based on my training and experience, I believe it can create friction between inmates if one inmate is receiving something that another inmate is not receiving such as a special diet. Inmates sometimes and some inmates often use such methods to assert a type of "bragging rights" or gloat over another inmate. Some inmates use the same methods to gloat in their verbal exchanges with jail staff, including corrections officers, service officers, kitchen staff and others who work daily in the jail.

14. Based on my training and experience and in particular on my discussions with Dave Sokol at the Shasta County Jail, I believe that special diet requests, including religious diet requests, create work and expense for the Shasta County Jail. The Jail kitchen serves approximately 350 meals to inmates three times as day. The jail creates and maintains a record regarding special diet requests for each inmate. The more special diet requests there are, the more work for Jail staff to make sure that each inmate's diet meets the requirements of Title 15 of the California Administrative Code. The more often the meal service to an inmate changes, the more work for the Jail to keep accurate records of the current dietary requirements for each inmate to insure that each inmate receives the correct meal.

15. Based on my experience and information from Dave Sokol, I am informed that the jail purchases food items in bulk and prepares food items to meet Title 15 requirements in bulk. Each time the jail is required to provide a special diet, the expense for that meal service increases and the time necessary to prepare the meal increases. For this reason, the jail attempts to limit the number of special diets, including religious diets that it prepares.

16. Based on my experience at the Shasta County Jail, and based upon my information from Dave Sokol, I have learned that frequently jail inmates who request a vegetarian diet change their mind a few days later and request that the kitchen provide a regular diet. I have been advised by jail inmates and corrections officers and kitchen staff over the years that jail inmates have indicated that they make requests for special diets at times simply because they are bored or simply because they want to assert an opportunity to make the jail give them something different to eat.

> 17. As of April 2012 and up to April 2013, the Jail policy was to review religious diet requests to determine whether the inmate was sincere in his religious basis for the request in order to avoid unnecessary meal changes arising from the above circumstances. The Jail did not have any policy or purpose to deprive an inmate who had a sincere religious belief of a religious diet if the Jail could provide that diet in compliance with Title 15 and the Jail did so. However, my training and experience indicated that some religious diet requests made by inmates were not based on a sincere religious belief, but were for other reasons as stated in this declaration. For that reason, the Jail policy was to determine as we could best reasonably determine which were not sincere, to provide for the efficient administration of Jail meal service in compliance with Title 15 and to reduce friction between inmates and jail staff over special diet requests where possible. . .

Decl. of Kent, Ex. E.

The forms defendant Kent reviewed concerning defendant Harmon's interview of plaintiff revealed to Kent that Harmon asked plaintiff whether he had a place of worship or a spiritual ruler, and plaintiff indicated he did not. Id. Plaintiff was also asked whether there are any Buddhist holidays. Plaintiff responded "Bhat" which is not a Buddhist holiday. Id. Finally plaintiff was asked seven questions from a document titled "Buddhist Questionnaire." The questions were as follows:

> A. What is another name for Buddha?
>
> B. What is Vesak?
>
> C. What month of the year is Vesak celebrated?
>
> D. Do Buddhist (sic) believe in a creator or God?
>
> E. What is the purpose of life to a Buddhist?
>
> F. What is Dukkha?
>
> G. What are the Four Noble Truths?

Id. According to research conducted by defendant Harmon, the only response given by plaintiff which was correct was his response "no" to question D. Id.

In his declaration in support of his opposition, plaintiff does not meaningfully dispute that the decision as to whether plaintiff would be provided a vegetarian diet was ultimately up to defendant Kent. Furthermore, he does not meaningfully dispute that he was aware that to obtain a special religious diet he would have to use the "Request For Information" process described

8

1 above. While he questions the authenticity of some of the written materials reviewed by
2 defendant Kent when Kent was attempting to determine whether plaintiff should be given a
3 vegetarian diet, he does not question that Kent actually reviewed those documents or point to any
4 evidence suggesting he did not. Essentially, plaintiff's issues are more with the authenticity of
5 the information provided to Kent by defendant Harmon.

6 While there is ample evidence suggesting plaintiff was not a Buddhist when he requested
7 a vegetarian diet at the Shasta County Jail, his assertion that he told defendants that he is creates a
8 factual dispute as to whether his professed beliefs in Buddhism were sincere. The court concludes
9 that to find as a matter of law that an inmate's assertion that certain conduct is mandated by his
10 religious beliefs is or is not sincere is impossible, as determining a person's state of mind cannot
11 be done absent concession or an undisputed material contradiction.

12 Nonetheless, after reviewing all of the evidence before the court, the court finds that
13 defendant Kent's decision to deny plaintiff a vegetarian diet was reasonably related to legitimate
14 penological objectives. It cannot reasonably be disputed that making special provisions for the
15 diet of an inmate causes extra work and expense, and defendant Sokol provides evidence
16 supporting this in his declaration. This being the case, it was entirely appropriate for defendant
17 Kent to undertake at least some minimal inquiry as to whether plaintiff really is a Buddhist and
18 really does require a vegetarian diet before providing one. The court offers no opinion as to what
19 showing had to be made to Kent before he would be required under the Constitution to provide
20 plaintiff with a vegetarian diet, but the information which was reviewed by Kent provided a clear
21 basis for Kent to deny a vegetarian diet.

22 For these reasons, defendant Kent will be granted summary judgment with respect to
23 plaintiff's remaining First Amendment claim against defendant Kent.

24 C. Defendant Harmon

25 In his declaration in support of his opposition to defendants' motion for summary
26 judgment, plaintiff clarifies his allegations concerning defendant Chaplain Harmon as follows:
27 1. Shortly after plaintiff was arrested, he was informed that he must write the jail chaplain
28 to request a religious based diet. After learning this, plaintiff wrote to defendant Harmon asking

9

that he approve a religiously based vegetarian diet for plaintiff. Harmon responded by saying "no."

      2. After doing some legal research, plaintiff submitted a second request for a vegetarian diet in October 2012. In response to the request, plaintiff was interviewed by defendant Harmon. Plaintiff describes the interview as follows:

> [Harmon] started the interview by being confrontational and telling me he'd already denied my request once. I made it clear that my religious diet "was based on a sincerely held belief and he could not deny me my rights." He had a clipboard and asked me a question from what he was looking at. He asked "what other name is there for Buddha?" I immediately answered "The enlightened one" and after a brief pause asked "what does that have to do with my vegetarian diet?" Harmon and I began to get into an argument about manipulating the system and causing him extra work. He once again boasted how he had already once denied my request and I wouldn't get a change now.
>
> Harmon asked me no more questions, instead gave me papers to fill out. I took them to my cell and put my name and number at the top. That's all the writing I did. I could not fill out anything else. I sent them back to Harmon attached to a request form explaining I did not have any info at this time. I've recently learned that not only were the forms filled out with false information but my signature was forged as well. At no time during this incarceration have I ever filled out or signed any forms for religious diets until the policy changed in April 1st, 2013.

      The court assumes that plaintiff is alleging that the paper Harmon gave to plaintiff to complete is the document which appears as page 1 of Exhibit J attached to defendant Harmon's declaration. In the document, plaintiff is asked if he has a spiritual leader and a place of worship. On the form, the response written is "none." Plaintiff is also asked to provide authorization to contact a family member about plaintiff's religion. A box indicating "no" is checked on the form. Even if the court assumes this document was completed by somebody other than plaintiff, plaintiff admits that he refused to provide answers to the questions asked on the form and does not give an adequate explanation as to why.

      In his affidavit, defendant Harmon indicates that he serves as a volunteer chaplain at the Shasta County Jail. He also admits that until April 2013, he interviewed inmates who requested a religious accommodation with respect to their diet in order to determine if the request was sincere. He describes his interaction with plaintiff as follows:

3. In October 2012, I received a request through jail staff from Inmate Jesse King for a religious based diet based on the Buddhist religion. [Exhibit I.]

4. I interviewed Mr. King to evaluate his sincerity on October 16, 2012. . . I am not a Buddhist, but I have conducted research into the Buddhist religion in order to competently perform my duties to evaluate the sincerity of an inmate request for a religious diet based on the Buddhist religion and on other religions commonly identified by inmates as the basis for a religious diet. In that capacity, I have prepared basic questions in written form regarding simple and basic tenets of the Buddhist religion, and I used those forms in my interview with Mr. King on October 16, 2012. [Exhibit J.] As indicated by Exhibit J, Mr. King was not able to correctly answer the majority of the questions that I directed to Mr. King during the interview. Further, and of significance to me in my evaluation of Mr. King's sincerity, his attitude during the interview did not convey sincerity because he appeared to be rolling his eyes in response to my questions and at times smirked in a manner that I interpreted to be insincere.

5. As part of my evaluation of Mr. King's request, I reviewed Jail records regarding Mr. King and noted that Mr. King was first incarcerated on this occasion in the Shasta County Jail on April 28, 2012, yet Mr. King did not request a religious diet until October 2012. I also noted from Jail records that when Mr, King was taken into the jail on April 28, 2012, Mr. King indicated a response to questions directed to him from Jail staff at intake that he had no religious preference.

6. As a result of my interview of Mr. King and my review of Jail records as indicated above, I believed that Mr. King was not sincere about his professed religious belief in Buddhism nor about his request for a religious diet. I wrote a report regarding my conclusion to Jail officials. I believe it was directed to Lt. Dave Kent, and recommended in my report that I did not believe Mr. King was sincere in his request. [Exhibit K.] While I made a report about Mr. King's religious diet request, I did not have the authority to grant or deny any religious diet requests. Nor did I make the decision to deny Mr. King's religious diet.

7. I also recall that while serving as Jail chaplain in November 2011, I received through Jail staff, a request from Plaintiff King for a religious diet based on the Buddhist faith. I interviewed Mr. King in November 2011 for the same purpose. In a similar manner, I used preprinted questions regarding basic tenets of the Buddhist faith to interview Mr. King. In November 2011, Mr. King could not answer basic questions correctly about his professed Buddhist faith. [Exhibit L.] As a result of my interview of Mr. King in November 2011, I believed at that time that Mr. King was not sincere in his request for a religious diet based on Buddhism. I recommended at that time to Jail officials that Mr. King was not sincere in his request.

Taking the facts in the light most favorable to plaintiff, there is at least a genuine issue of material fact as to whether defendant Harmon is liable for denial of free exercise of religion under the First Amendment. Again, a genuine issue of material fact exists with respect to whether plaintiff's assertion to jail officials including defendant Harmon that he is Buddhist were sincere. Plaintiff points to evidence in the form of his own declaration indicating that Harmon provided misinformation to defendant Kent regarding whether plaintiff's professed beliefs are sincere and there is at least a genuine issue of material fact that this misinformation is what caused plaintiff's request for a vegetarian diet to be denied. If a jury were to find that Harmon passed misinformation to Kent, the jury could also find that there was no justification reasonably related to legitimate penological interests for Harmon causing plaintiff to be denied a vegetarian diet since causing the vegetarian diet to be denied by deception is not a legitimate basis for denial.

Defendants assert defendant Harmon is immune from plaintiff's remaining First Amendment claim under the "qualified immunity doctrine. Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, that court must answer two questions. The first is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201 (2001). A negative answer ends the analysis, with qualified immunity protecting defendant from liability. Id. If a constitutional violation occurred, a court must further inquire "whether the right was clearly established." Id. "If the law did not put the [defendant] on notice that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202.

Defendants assert "[t]o the extent Plaintiff asserts liability against Harmon based upon his recommendation, Mr. Harmon acted in good faith and reasonably in forming his conclusion that Plaintiff King did not hold a sincere religious belief that required a religious diet." "Harmon acted reasonably believing that his actions complied with the law and is entitled to qualified

1  immunity." As indicated above, there is at least a genuine issue of material fact as to whether
2  defendant Harmon's finding that plaintiff was not sincere in his professed Buddhist beliefs was
3  intentionally misleading and not in good faith. Therefore, defendants' qualified immunity
4  argument concerning plaintiff's remaining First Amendment claim against defendant Harmon
5  will be rejected.
6      For these reasons, defendants' motion for summary judgment concerning plaintiff's
7  remaining First Amendment claim against defendant Harmon will be denied.
8      D.  <u>Defendant Sokol</u>
9      While plaintiff points to evidence indicating that he asked defendant Sokol, the head of
10 the kitchen at the Shasta County Jail, to provide him with a vegetarian diet, there is no evidence
11 plaintiff informed Sokol he required a vegetarian diet because of his religious beliefs. P's Decl.,
12 Ex. 1. Also, as indicated above, defendant Sokol did not have the authority to approve a
13 religiously-based vegetarian diet. For these reasons, defendant Sokol will be granted summary
14 judgment.
15     E.  <u>Defendant Bosenko</u>
16     Plaintiff alleges that he made a direct request to Sheriff Bosenko that he be provided with
17 a vegetarian diet. In his declaration attached to his opposition to defendants' motion for summary
18 judgment, plaintiff clarifies that while Sheriff Bosenko was touring the jail one day, plaintiff
19 asked Bosenko to "help me out with my diet." There is nothing before the court suggesting
20 defendant Bosenko was involved in any way in denying plaintiff a vegetarian diet.
21     In any event, there can be no liability under 42 U.S.C. § 1983 unless there is some
22 affirmative link or connection between a defendant's actions and the claimed deprivation. <u>Rizzo</u>
23 <u>v. Goode</u>, 423 U.S. 362 (1976). Furthermore, vague and conclusory allegations of official
24 participation in civil rights violations are not sufficient. <u>Ivey v. Board of Regents</u>, 673 F.2d 266,
25 268 (9th Cir. 1982). Because there is nothing before the court suggesting defendant Bosenko
26 took any affirmative step which resulted in plaintiff being denied a vegetarian diet, or that the
27 delegation of the authority to decide whether plaintiff would receive a vegetarian diet to
28 defendant Kent was somehow Constitutionally impermissible, defendant Bosenko will be granted

summary judgment with respect to plaintiff's remaining First Amendment claim against him. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) (supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them").[2]

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' October 11, 2013 motion for summary judgment (ECF No. 51) is granted in part and denied in part as follows:

    A. Denied with respect to plaintiff's remaining First Amendment claim against defendant Harmon;

    B. Granted with respect to plaintiff's remaining First Amendment claims against defendants Bosenko, Kent and Sokol; and

    C. Granted with respect to any remaining claim for injunctive relief.

2. All remaining claims arising under the Religious Land Use and Institutionalized Persons Act are dismissed resulting in the dismissal of defendants Kent, Sokol and Bosenko from this action.

3. Plaintiff shall file his pretrial statement concerning plaintiff's remaining First Amendment claim against defendant Harmon within 21 days of service of this order. Failure to file a pretrial statement within 21 days will result in dismissal of this action without prejudice. Defendant Harmon shall file his pretrial statement within 14 days of service of plaintiff's.

Dated: July 11, 2014

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

---

[2] In light of the foregoing, defendants Kent, Sokol and Bosenko are also immune from any § 1983 claim for damages under the "qualified immunity" doctrine because there are no genuine issues of material fact as to whether the actions of Kent, Sokol or Bosenko amount to a violation of plaintiff's civil rights. See Harlow, 457 U.S. at 818.

14